to hear your argument, Council. You may have pleased the court. Kerry Culpepper appearing on behalf of the Appellant Capsule Studios Corporation and also the petitioner in the District Court. If I may, I would like to reserve three minutes for rebuttal. You bet. Just watch the clock, please. Thank you. The District Court's decision that a DMC subpoena cannot be issued to Cox was a legal error in statutory interpretation that is subject to a de novo standard review at this court. Capstone urges this court to reverse the District Court. There are a few, I'm sure that your honors have read the briefs, there are a few issues I want to raise. First, Capstone is an independent film producer and financing company. Selling licenses to authorize sales of Capstone's movies is the lifeblood of Capstone's business. Independent studios like Capstone cannot survive if their movies can be freely stolen by subscribers of service providers such as Cox's. Thankfully, Congress recognized this problem in 1998 and promulgated the Digital Millennium Copyright Act, the DMCA. Council, we have carefully read your briefs and we appreciate that this is an important issue, a very important issue. So could you go to the legal error, please? Yes, your honor. The District Court adopted the conclusions of the circuit courts, the D.C. Circuit Court of Appeals and the 8th Circuit Court of Appeals of Verizon and Charter 20 years ago. There, now the decision in those 2 cases is that an internet service provider in those cases, in those cases it was Verizon and Charter were mere conduits to the infringing material and because they were mere conduits, they could never be issued a ballot DMCA notice because a mere conduit cannot take down anything in response to a notice. Those decisions 20 years ago and to be upfront, Capstone's position is they were wrongfully decided. However, this court can distinguish those 2 cases on their facts because here Capstone's position has consistently been that Cox is more than a mere conduit to the infringing material. Can I stop you there because this is a discrepancy that runs throughout the briefing and I think that you're just articulating it. I think your position is there's a question about Cox's status as a 512A service provider as opposed to a question about the function that Cox provided in relation to this particular infringing activity. So, which is your position? What is it you think we're looking at? Well, there are 2 parts here. Our argument is that what we focused on is Cox as a 512A or 512D service provider. However, we attacked the premise of Verizon and Charter which kind of draws on the conclusion that all 512A service providers are mere conduits and that's just not the case. That's not the language of the statute. That's not consistent with the wording of the statute and that's not consistent with this court's precedent in Ellison v. Robinson. I'm not trying to get away from your question. I hope that I answered your question. Well, not really, but I hope springs eternal. You might get there. I appreciate it. I think you're making both arguments is what I'm trying to say and it would be helpful to me if you could keep them separate. So, one is just the legal question about whether an entity that acts as a 512A service provider can be subject to a 512H subpoena. You know, can that happen? And then there's a question of fact about how in what capacity did Cox function in relation to this particular act of infringement. Those are 2 different things, right? Yes, Your Honor. So, as to the first and you make both arguments and so my question is, sir, what's your best argument that the court legally erred when it decided that that it was going to align with Verizon, you know, the D.C. Circuit case and the 8th Circuit case on the first question? Why was he wrong? The first, this court ignored this court's decision in Ellison v. Robinson that states that a 512A service provider can store the material for 14 days and still be considered a 512A service provider. And when you store something for 14 days, that's inconsistent with being a mere conduit to the material. And, you know, our position is if you look at Ellison v. Robinson and evaluate the facts here consistent with Ellison v. Robinson, you can conclude that Cox could take actions in response to a DMC notice. If you look at excerpt of the record 235, which is an example notice that was to Cox in this case, you can notice that the notice was sent within a day of the observance of the infringing material. So, if we look consistent with Ellison v. Robinson where this court concluded that a service provider could store the infringing material for 14 days and still be a 512A service provider, here Cox could have taken action within that 14-day period. My second strongest argument is that a conclusion that a 512A service provider is not subject to the notice or takedown provision is inconsistent with other sections of the statute, such as 512E, where Congress explicitly puts conditions on a 512A service provider with respect to notices. Although this is the case when the 512A service provider is a university. I can go into further the textual argument of why a 512A subpoena should be applicable to Cox. Well, you can do whatever you want with your time. We have carefully read your briefs and I think you should argue whichever points you want to argue. Thank you, Your Honor. The, you know, Congress knew how to say a subsection was not applicable to a 512A service provider. In multiple sections, Congress points out that this part is not applicable to 512A. You know, I point out in 512J, Congress explicitly says that this injunction is not applicable to 512A service providers. It would be inconsistent with that language to suddenly assume that because Congress did not repeat the 512C notification language again in 512A, that it's not applicable to 512A service providers. Why is that? I mean, there are four safe harbors, right? And three of them have notice and takedown provisions and one of them doesn't. That's consistent. You know this, of course, because that's the reasoning of Verizon. And I think you've acknowledged it in your briefing. So what the district court thought is that is a very strong textual clue that those safe harbors have to do with, you know, storage capacity. And so why is that, why did the district court err by considering that when he looked to the 512A safe harbor that doesn't have a notice and takedown provision? Yes. First, I don't want to sound like a broken record, but if you look at the 512E here, the court explicitly applies the notice provision to a 512A service provider. Now going back to your argument, it's true that the 512C language, the notice requirements are set forth in 512C. In 512B, the notice requirements are repeated, but they're only tweaked to make them particular to the functions of a 512B service provider. In 512D again, portions of the notice requirement are repeated, but they're only tweaked to be consistent with the functions of a 512D provider. For example, in 512B, the notice is only repeated a bit to make clear that in your notice you need to include the name of the website from which the infringing material originated. There was no need to repeat that language again in 512A because there was no need to tweak the notice language with respect to the functions of a 512A service provider. Sir, so you've got, excuse me for interrupting, you wanted to save some time and you haven't yet turned to your alternative argument, which is that Cox qualified under 512D. Do you want to address that? Yes, Your Honor. What happens here fits squarely within the language of 512D. It's undisputed that Cox assigns the IP address that is used by the customers. Cox provides the modem that the IP address is the online location where other participants in the BitTorrent network access pirated copies of the material from, in this case, the Cox subscriber. So you know that the district court considered this argument and the district court reasoned that an IP address doesn't link to infringing content any more than, you saw opposing counsel's analogy to a telephone. It doesn't link any more than just this sort of inanimate object, sort of what the user does with it. And what the district court reasoned about the IP addresses, right, is that it is the peer-to-peer file sharing network that links to infringing content, not the IP addresses. So could you tell me what's your best shot at why that reasoning was incorrect? Well, first that's that reasoning, a telephone reasoning, that's not correct. But let's look at what happened here with John Doe's objection. You can set aside the telephone example if you want, but what would be helpful for me is if you could tell me why you think the district court erred in its reasoning. The district court's argument was that the IP address is not an information location tool because the requirement is of active assistance. That was the district court's primary argument. He said this is the link, he said that it's the peer-to-peer file sharing network that's doing the linking. That's another way of saying it's a passive, that's another way of saying that you're trying to hold the service provider liable for passive activity. Now it's true that the user is the one who initiates the transaction, but the, it's not disputed that the service provider routes or transmits that infringing material to the other participant on the BitTorrent network who's requesting a copy of the pirated material. And it's not disputed that the modem that Cox provides the subscriber is what makes that user's computer online. It's no different than a website. When you access a website, you go to the HTTP link of the website. The HTTP link is the online location to access the website. That website is stored on someone's computer somewhere and it's made online by a server or a modem by that person. And an HTTP address is one of the type of information location tools that Congress explicitly included in 512D. So, you know, it's true that on a BitTorrent, in the context of but it's also true that Cox, in that case, when the user is a Cox user, Cox routes the transaction, Cox sets the information location tool, which is the IP address, and Cox has the ability to disable that link to the infringing material. Did you want to save three minutes? Yes, Your Honor. Thank you very much. You're welcome. You're just under three minutes, so we'll stop you there and we'll put three minutes on the clock when you come back. We'll hear from opposing counsel now, please. Thank you, Your Honors. May it please the Court. Chris Cariello for Appellee Cox Com. For all the seeming complexity in the briefing, this really comes down to one simple and irreparable problem with the application capstone made for a subpoena. To obtain a subpoena under subsection H, you need to, quote, identify material that is to be removed or access to which is to be disabled along with the location from which it's to be removed or access to be disabled. Capstone did not do that, because you cannot do that when it comes to a conduit ISP. Can I ask why did Cox comply with the subpoena? Cox complied with the subpoena as to those who did not object to the subpoena, because it was a standing court-issued order. It was unchallenged, and insofar as it was unchallenged, it puts Cox in the position of being in receipt of some process that requires disclosure. As to John Doe, who did object, and Cox gave everyone an opportunity by notifying them, giving them an opportunity to object, Cox waited until there was clarity about its legal obligations. Your Honor, your legal obligations, Cox thought its legal obligations were unclear here. When Cox receives a subpoena that is on its face issued from a court, and I should add Cox serves 6.5 million subscribers, it receives thousands. Right, it's not a small player, which is why I was surprised by the reaction here. So I think when Cox has received court-ordered process that issues from a court, it gives subscribers an opportunity to object to it. If they do not, then what it has is a standing court-issued document that puts it in the very difficult position of deciding whether to comply or not. And its policy, and maybe your Honor could take issue with that, but its policy is to comply with those sorts of court orders. We're not in the business of taking umbrage when someone complies with a court order. That's fine. I was just trying to figure out, I mean, it is noticeable, right, because the argument that you have here is that is quite unequivocal that you didn't have an obligation to comply, but did. So maybe you've given me the best answer you can. Understood. So again, it is a very difficult place to be in if you are a service provider and you've received one of these subpoenas. It is settled law in two circuits, obviously, that they cannot issue. It is not yet settled law in this circuit. What Cox did do is give John Doe an opportunity to object. Once John Doe objects, it is no longer, Cox can no longer presume that this is valid, you know, court process and has to respond. So just to be clear, and I had the same question, but just to be clear, it's your position really that Cox didn't have to comply with the subpoena as with respect to anybody. That's correct. These subpoenas, the subpoena ought not to have issued within the meaning of the statute is our position. But your client does it just because it's easier, because if nobody objects, they don't have to go to court to object to the subpoena, lots of expense. They just, if nobody objects, they'll do it anyway, even though they're not compelled by the law to do it. That's the position. As long as it does not violate some other interest or some other legal position, then yes, it does. And the point that I was making before about receiving thousands of subpoenas a year, it's a very, and I don't mean DMCA subpoenas, I mean thousands of requests from law enforcement. Cox has to have a sort of policy that it applies, where it tries to do right by courts, rights holders, and its subscribers, and that was what it aimed to do here. Your Honor, I don't need to belabor the statutory text and structure here, which I think is relatively clear. Reading the statutory text takes two steps. There is subsection H, and in particular, subparagraph 4, which requires that for a subpoena to issue, the application has to have a notification that satisfies the provisions of C-3A. Step two, we move up to C-3A, and we look at those provisions. In particular, Romanet 3 of C-3A requires you to identify the infringing material that is to be taken down, or to which access is to be disabled, and the location of it. That is what you, that is what is required to be effective. The only remaining step for this court, the only remaining step for Verizon, was to look at the application, that's at ER 239 to 245, and see if it identifies material to be taken down by Cox, and the location from which Cox is to take it down or disable access. It doesn't, because again, it cannot. Cox doesn't store material as a conduit ISP that merely transmits from A to B. You just did it again. There are places, and certainly the declaration from Hall treats or speaks of Cox as a status, as a 512A service provider, sort of for all purposes, as though it wears that hat and only that hat. I think that is not quite correct, and I'm not trying to split hairs here, but I do think it's an important distinction. Are you pushing back on that, or do you agree that the question here is what role did Cox play in this particular act of infringement? The latter. All that matters here is Cox's conduct with respect to the alleged infringement. Why was the declaration that was offered by Cox one that is quite contrary? It doesn't say anything about the role that Cox played on this occasion. It just mirrors really the statutory language, as though the question was status. I see, Your Honor. So Cox was submitting a declaration that addressed directly what the district court was asking. I don't think there was ambiguity about what the district court meant. That is how the order meant, and I thought you might answer the question that way, but I think that then when the district court, when he called for supplemental briefing, that is quite different than how the district court discusses this in his decision. Your Honor, so if I may, what I started with was that there's only one simple issue that this case turns on. It is whether the application for a subpoena identifies material that Cox is to take down or disable access to, and the location of that material. That's really all this court needs to decide, and I agree with you. There is a lot of 512D entities. At the end of the day, H-4 requires you to comply with the provisions of C-3A. C-3A requires you to identify the material that is to be taken down in its location. Do you think the district court shouldn't have asked the question it asked? I think it is an entire... As a matter of fact, what role Cox played in this infringing activity. That was an entirely appropriate question for the district court to ask. I think it was. I think it bears on the question. I think it's how Verizon and analyze the question. I don't mean to suggest that it was overreach to determine... Okay, so what am I missing? I'm not trying to give you a hard time. I'm trying to figure out why you think I don't need to care about the response to that. So I was just trying to offer the simplest, narrowest way, where the rubber hits the road, so to speak. I do not think it is in dispute what Cox does here. The status of it, whether it's 512A or 512D as a legal matter, I think Mr. Culpepper does dispute that, and I can get into why what Cox does is not a 512D entity. But Cox is not storing information at the direction of a user under C. It's not caching information under B. And then the question is whether it is referring or linking under 512D. And ultimately, I think there is no dispute on this record, and Amber Hall's declaration makes that plain. All Cox is doing with respect to this case is transmitting information that the alleged... All Cox did, by using active tense verbs. And again, I'm not trying to drive you crazy, but that's why you're miscommunicating with opposing counsel. Understood. All Cox did and is alleged to have done with respect to the infringing materials identified in ER 239 to 245 is transmitted from the IP address that is listed there, which is just a connection to a home or business, to some other point on the internet. Now, Mr. Culpepper does argue that Cox could have theoretically stored information for some transient duration while it's on its way from point A to point B. The problem with that argument is even if it were true, and there is nothing suggesting that it is true, that there was some location, and Ms. Hall disclaims that it was ever available on Cox's server in that way, Capstone's obligation would be under C3A Romanet 3 to identify the location of that information from which it can be taken down. It did not do so, because it cannot do so, because that is not a location that actually exists and is accessible. But I think he recognizes that. And he comes back and his argument is not... It doesn't just need to identify the location from which it could be taken down. He's arguing instead about the ability to interrupt. So yes, I do think Mr. Culpepper's argument ultimately is that terminating, or perhaps not terminating, he would say not terminating, but ceasing access through an IP address is similar to the concept of disabling access to infringing material. That doesn't work for a few reasons. The first reason is the DMCA refers very specifically to material in various places. C3A little 3 refers to the material itself, because it is in service of the parallel provisions C1C, and then I think it's B2E and D3 for the other subsections, that when you get an effective notice, say you respond expeditiously to remove the material itself or disable access to the material. So it's very material specific. And of course, subsection A, by contrast, refers to providing connections. So there's a difference between a location of material and a connection itself. Beyond that, the DMCA elsewhere speaks of termination of access entirely. Now, Mr. Culpepper's point is, well, you can do something a little bit short of termination that still blocks the entire access to the material. It's like saying that you denied your kids access to the cookie jar by locking them out of the house entirely. But my point is that when you look at the statute, and I think the district court made the same point, there is a distinction between this proportional step of receipt of a notification, disable access, and go through the process of determining whether it's infringing or not, and the proportional step of cessation of service entirely. Right. And what his argument really is, is that disabling access is consistent with, of course, protecting the rights of the copyright holders in the first instance. It's just my problem is that's just not the balance Congress struck. And so it's a remedy that seems to me to be, maybe Mr. Culpepper will want to speak to this. It's a remedy that would be consistent, I suppose. It's not the one Congress chose by my read of the statute. So I think it's a remedy that's not authorized by the statute. Precisely, Your Honor. I do think that Congress was thinking about all interests when it passed the DMCA. It's thinking about rights holders' interests. It's also thinking about user interest and service provider interests here. Congress doesn't pursue ends at all costs. In this instance, it decided not to subject subsection A service providers to these sorts of subpoenas, or their subscribers to these sorts of subpoenas. Let me just see if my colleagues want to get in a word edgewise. Judge Desai? Judge Fletcher? I don't think we have any additional questions. Thank you very much, Your Honors. I think just to conclude briefly, the district court did a commendable job of managing this to the right result under the statute and under a full record. We ask that the court affirm. Thank you. Thank you. Madam Clerk, could you put, there you go, three minutes back on the clock, and we'll hear from Mr. Culpepper. Thank you very much, Your Honor. First, I want to respond to the gentleman's argument that the notice did not identify any material. If you look at ER 235, the notice says what the infringing work is after Ever Happy. It gives the infringing file name. It identifies the infringer's court number. It identifies the IP address that was there. So Cox was given a notice that gave it sufficient information to identify the material and the location of the material. The second point I want to address is with respect to the measures that Cox could use to stop ongoing infringing activity. And it's important, the alternative word here used is activity, infringing activity. There are more exclusive rights copyright owners receive besides the right of reproduction. There's a right of distribution. There's the right of publication. And when a BitTorrent user is using BitTorrent, they are distributing copies of Capstone's copyrighted work. So that reads on the infringing activity. It's true Capstone discussed one measure, such as null routing, to stop just ongoing distribution of copies of its work. However, there are other measures that Cox can use to stop ongoing distribution of copyrighted  Cox can use the measures that- Can I interrupt you right there? You make that point repeatedly, and we're all aware of when this statute was passed and how technology has changed and it will continue to change. But it seems to me what they're capable of is one thing. But if you've conceded the point, and I think you have, that the question is what function did they serve on this occasion? Then I'm not sure why it matters that they had other capabilities that would have allowed them to, you think, disable access in the way you frame it. So do I misunderstand your position? I thought your position was that you agreed after Perfect 10 that the question is what role did they play vis-a-vis this particular act of infringement? Yes, that's true. The question is what role they play. I, we did focus our arguments on 1.512a and 512d. However, as your honor pointed out, we never had an opportunity to develop the issue of what services Cox provided to this particular subscribers because Cox never raised any objections to the subpoena. Cox never filed a motion to quash. Effectively, the district court shifted the burden to Capstone to prove up the validity of the subpoena when this, according to this court's precedent, when a party is challenging the validity of a subpoena, is that party's burden to set forth evidence and prove that the subpoena is invalid. That didn't happen here, and because the magistrate judge issued that order without even raising or hinting at this issue for Capstone, Capstone wasn't giving a meaningful opportunity to submit evidence. I see my time's expired. I just, I'd urge the court to at least remand this case and give Capstone a chance, a meaningful opportunity to submit and obtain evidence of what services Cox provided to this customer. Thank you for your time, and thank you for allowing me to appear remotely. Oh, you're welcome. We're happy to have you appear, and we appreciate the trouble that you went to be here. All of you, appreciate your careful briefing and argument. We'll take this one under advisement, and we'll move on to the next case on the calendar.
judges: FLETCHER, CHRISTEN, DESAI